# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

DAN FRIEDMAN                                          :
                   Plaintiff,                :
                                    :   Civil. No.
         -against-                                 :
                                    :
BLOOMBERG LP                                         :
CHRISTOPHER DOLMETSCH                                 :   March 26, 2015
ERIK LARSEN                                          :
MICHAEL HYTHA                                        :
ANDREW DUNN                                          :
MILLTOWN PARTNERS                                     :
PATRICK HARVERSEN                                     :
D.J. COLLINS                                         :
OLIVER RICKMAN                                       :
PALLADYNE INTERNATIONAL ASSET
MANAGEMENT BV,
ISMAEL ABUDHER and
LILY YEO

                    Defendants.

# COMPLAINT
# (AND JURY TRIAL DEMAND)

## Introduction

This case arises from a defamatory article published by defendant Bloomberg LP

on March 27, 2014. The article was about a lawsuit filed by plaintiff Dan Friedman in the

U.S. District Court for the District of Connecticut ("Inducement Case").

The subject matter of the latter was (and is -- it is currently pending) defendant

Palladyne International Asset Management's ("Palladyne") fraudulent inducement (in

collaboration with its recruiter, London-based SThree Ltd.) of Friedman to come to work

with Palladyne, a self-styled "hedge fund" based in Amsterdam, The Netherlands. As the

Inducement Case alleges, Palladyne was in fact no more than a front for $700,000,000 of Libyan patrimony funneled to Palladyne by the late Shukri Ghanem, defendant Abudher's father-in-law and the former Prime Minister of Libya under the deposed Ghaddafi regime.

Palladyne presented itself to Friedman as a hedge fund with a "worldwide clientele" and further boasted of "[excellent] optimized returns." Additional misrepresentations were made about Palladyne's clientele, its competence, its management, its infrastructure, its trading history and its capabilities.

The Inducement Case arose from a studied, systematic and fraudulent series of misrepresentations by Palladyne and its agent, SThree, to lure Friedman to a company that was little more than a fancy parking lot for defalcated money. Abudher, whose father-in-law, Ghanem, was head of the Libyan National Oil Company at the time that he diverted the funds to Palladyne, had no prior experience running a hedge fund until his father-in-law furnished his "seed money."

Friedman filed his Inducement Case on March 25, 2014. On March 27, 2014 Bloomberg published an article about the case that contained, as set forth below, multiple false and libelous statements that defamed Friedman. Further, Bloomberg accepted -- without question or even a pretense of fact checking – Palladyne's defamatory statements about Friedman. And contrary to long-established professional journalistic standards as well as its own, Bloomberg deprived Friedman of the most rudimentary fairness by failing to contact him for comment.

Finally, to compound the harm and as evidence of bad faith, Bloomberg refused three separate entreaties from Friedman to correct the defamatory statements.

**Parties**

1.      Plaintiff Dan Friedman is a lifelong domiciliary and resident of Connecticut who currently resides at 850 Noank Road, Mystic, Connecticut. Prior to the occurrence of the events set forth below, he was a financial services executive.

2.      Defendant Bloomberg L.P. is a limited partnership registered in Delaware. It maintains its principal place of business at 731 Lexington Avenue, New York. *Bloomberg News* includes 1,900 editors and reporters in more than 150 bureaus serving print and broadcast media throughout North and South America, Europe and Asia.

3.      John Does 1 through N are the managing partners in Bloomberg LP.  The managing partners of Bloomberg are not publicly disclosed and will be added by name after discovery.

4.      Defendant Christopher Dolmetsch is a reporter for Bloomberg News who covers court matters. His business address is at 731 Lexington Avenue, New York, New York. Dolmetsch was a co-author of the defamatory article.

5.      Defendant Erik Larsen is a reporter for the U.S. Legal Team at Bloomberg News. His business address is 731 Lexington Avenue, New York, New York. Larsen was a co-author of the defamatory article.

6.      Defendant Michael Hytha is an editor and leader of the U.S. Legal Team at Bloomberg News. His business address is Pier 3, Suite 201, Embarcadero, San Francisco, California. Hytha was an editor of the defamatory article.

7.      Defendant Andrew Dunn is an editor at Bloomberg News. His business address is at 731 Lexington Avenue, New York, New York. Dunn was an editor of the defamatory article.

8.     Defendant Milltown Partners is a partnership registered under the laws of the United Kingdom. Its principal place of business is at 140 Brompton Road, London SW3 1HX, United Kingdom. Milltown Partners purports to "advise companies, individuals and families on managing communications, reputation and privacy."

9.     Defendant Patrick "Paddy" Harverson is the managing partner of Milltown Partners and maintains his business address at 140 Brompton Road, London SW3 1HX, United Kingdom. Prior to forming Milltown partners in or about 2012, Harversen served as communications director for H.R.M. Prince Charles and, before that, for the Manchester United soccer organization.

10.    Defendant D-J Collins is a partner in Milltown Partners and maintains his business address at 140 Brompton Road, London SW3 1HX, United Kingdom. Prior to forming Milltown Partners with Harversen in or about 2012, Collins was vice president of Google in charge of public policy communications in Europe, the Middle East and Africa.

11.    Defendant Oliver Rickman is a partner in Milltown Partners and maintains his business address at 140 Brompton Road, London SW3 1HX, United Kingdom. Prior to joining Milltown Partners, he was Google's Head of Strategic Campaigns and Planning, Europe, Middle East, Africa and Asia-Pacific.

12.    Defendant Palladyne International Asset Management B.V. ("Palladyne") is an entity organized under the laws of The Netherlands. Its principal place of business is at Gustav Mahlerplein 70, 1082 MA, Amsterdam, The Netherlands. On information and belief Palladyne has a corporate style structure, but if it asserts itself to being similar to a partnership, its shareholder/partners will be named as parties.

13.     Bainbridge BV and Palladyne Group are the shareholder/partners in Palladyne and will be formally named as partners if Palladyne asserts, as it has in the Inducement Case, that it is comparable to a partnership.

14.     Defendant Ismael Abudher is the chief executive officer of Palladyne and maintains his principal place of business at Gustav Mahlerplein 70, 1080 MA, Amsterdam, The Netherlands.

15.     Defendant Lily Yeo is the Chief Corporate Strategy and Business Development Officer at Palladyne. Her principal place of business at Gustav Mahlerplein 70, 1080 MA, Amsterdam, The Netherlands.

**Jurisdiction and Venue**

16.     This Court has subject matter jurisdiction of this action pursuant to 28 U. S. C. § 1331 because of the diversity of citizenship of the parties and because the plaintiff's damages exceed $75,000.

17.     This court has general jurisdiction over Bloomberg and specific personal jurisdiction over all defendants because the actions in question had as their principal purpose and result to have impact and cause damage in this State.

**The Sources of the Defamation and Bloomberg's Indifference
To Accuracy, Fairness or Journalistic Ethics**

18.     This case emanates from an article published on bloomberg.com, a website published and maintained by Bloomberg, on March 27, 2014 ("Article").

19.     That Article, attached as Exhibit 1, reported on a lawsuit filed by the plaintiff in the U.S. District Court for the District of Connecticut on March 25, 2014. A copy of the Complaint in that action is attached at Exhibit 2. The matter is currently pending before the Hon. Alvin W. Thompson.

20.     The Article claimed that Palladyne was "… sued in the US for as much as $500 million."

21.     The Article printed a statement from an unnamed Palladyne source who claimed that Mr. Friedman "repeatedly tried to extort money" from Palladyne.

22.     The Article printed a statement from an unnamed Palladyne source that Friedman was "…dismissed for gross misconduct."

23.     Under the standards of ethics and professionalism taught in the leading journalism degree programs, a reporter writing a story implicating one or more persons should contact all of the major subjects of the story for comment.

24.     Under the Bloomberg Businessweek Code of Journalistic Ethics which, according the Bloomberg's own internal rules, "journalists are required to sign annually," the following provision addresses the duty to contact the subjects of a story for their views:

> "**In our society, the press enjoys a remarkable degree of freedom. With that freedom comes the responsibility to practice our craft in accordance with the highest standards, to be accountable for what we publish**, and to avoid conflicts of interest.
>
> "… Otherwise, we could lose our most important asset: the trust of our readers, online visitors, viewers, and listeners in the credibility of the information and insights we provide.
>
> "We believe that our future depends upon preserving and enhancing this trust. Therefore, we must ensure that:
>
> 1. The integrity of our journalists is of the highest caliber.
>
> 2. We base our unique brand of journalism on accurate information, gathered honestly and presented fairly.
>
> 3. Our journalists' professional conduct is unassailable.

4. Our journalists' personal conduct, as it reflects on BusinessWeek, is beyond reproach.

"**All members of the BusinessWeek editorial staffs must uphold these principles**. This means everyone who works on the magazine, the Web site, or in our multimedia operations (including members of the art, production, and systems departments, all Web developers and programmers, and all assistants and clerical workers), be they full-time, part-time, interns, or freelancers.

"**Here are the rules by which they must live:**

"**3. Fairness.**

"**We give the subjects of a story -- people, companies, and institutions -- an opportunity to have their views presented. We include relevant portions of those views -- or report that the subject declines to comment.** We also present differing or dissenting opinions, though they may be subordinate to the main thrust of the story.

**If someone complains about a story, we will investigate promptly and even-handedly. If we are right, we will stand by the story regardless of who is complaining. If we are wrong, we will say so forthrightly and make whatever amends seem appropriate.**

(emphasis added)

25.    In direct dereliction of their own ethical and professional rules – which they are required to reread and sign each year -- neither the two primary reporters covering the story (defendants Dolmetsch and Larsen) nor their primary editors, defendant Hytha and Dunn (collectively the "Reporter and Editor defendants"), made any effort to contact Friedman -- by telephone, email or other means.

26.    Their conduct not only violated Bloomberg's (purported) internal ethical rules, but also violated what Bloomberg tells the public about its ethical principles. In the book entitled "The Bloomberg Way: A Guide for Reporters and Editors," (John Wiley and Sons, 2014), authored by Matthew Winkler (Bloomberg News' editor-in-chief) and Jennifer Sondag (Standards Editor, Americas), the "Fairness" rules are repeated and

emphasized to the general public:

> We strive to achieve *balance* and *fairness* in all reporting and news decisions. We make every effort to obtain a prompt and complete rebuttal to any accusation.

(emphasis in original)

27.     Further, there were four editors cited as responsible for the story: defendants Hytha and Dunn, along with Bloomberg editors Mary Romano and Fred Strasser. None of the *six* reporters and editors exhibited any concern that the story directly quoted an unnamed Palladyne source, or that Friedman was never given the opportunity -- even after they failed to contact him before publication -- to respond despite his multiple post-publication requests.

28.     Within hours of publication of the Article, Friedman gave Bloomberg the opportunity to rectify the errors that its reporters and editors had committed.

29.     Within six hours of publication of the story online, Alan Kaufman, counsel for plaintiff Friedman, contacted defendants Dolmetsch, Larsen, Hytha and Dunn via email ("first warning") to express concern about the above statements. That communication is attached as Exhibit 3.

30.     Regarding the alleged suit for $500,000,000, he wrote: "… we did not, have not, and will not seek $500 million in damages from Palladyne and SThree. The base claim is $44,941,000, as reported in the recent Wall Street Journal piece. We understand that a public relations firm for Palladyne has been shopping the tale of $500M. They do so because they wish to accuse Mr. Friedman of a grotesquely exaggerated claim [to] support [Palladyne's] claim that the case is "ludicrous."

31.     As reporters and editors focusing on Bloomberg's coverage of legal

issues, and working in a wealthy global company with access to unlimited in house and outside counsel, the Reporter and Editor defendants knew or should have known the specifics of the Federal Rules of Civil Procedure applicable to alternate pleading. And if they did not know, they clearly had a duty, under the ethics rules they signed each year, to inquire to confirm that alternate pleadings could not be aggregated.

32.     Friedman, through his counsel, also addressed the published allegation that he had "repeatedly tried to extort money from [Palladyne.]" He did so by explaining that his counsel had sent prior drafts of the Inducement Case to both Palladyne and SThree to see if an amicable, private resolution was possible, and to offer them the opportunity to challenge any allegations in the draft complaints.

33.     Friedman also had attempted settlement because, as he explained to the Reporter and Editor defendants, in the era of Google and other search engines, a story containing newsworthy subjects such as the Libyan revolution and the (then and still pending) Foreign Corrupt Practices Investigation of Goldman Sachs (Goldman is reportedly being investigated by the U.S. Department of Justice for having negotiated a $50,000,000 bribe that defendants Abudher and Palladyne had solicited), might pose difficulties for the Inducement Case defendants. Friedman wanted to give the latter the opportunity to settle without such complications.

34.     SThree, a global, publicly traded recruiting firm based in London that was also named as a defendant in the Inducement Case, refused outright to discuss settlement. After several meetings with Palladyne's counsel, no settlement was proffered and no terms were ever discussed.

35.     Friedman had learned of the "extortion" accusation prior to the Bloomberg

Article because the other, more responsible, publications covering the story had contacted him for a response and concluded that Palladyne's "extortion" claim should not be published.

36.     Because of concern over the charges in the article, Friedman's counsel advised the Reporter and Editor defendants that "[if] you [had] contacted me before publication I might have been able to supply you with this other information [that there had been settlement discussions]. I would appreciate your publishing a clarification and correction that points out the correct damage figure, points out that no cash or other demand was ever made, ever; and that Palladyne and SThree were given the opportunity to challenge any allegations and failed to do so."

37.     The Article also claimed that Friedman had been "dismissed for gross misconduct."

38.     Notwithstanding the ethical rules that they were obligated to sign each year, the Reporter and Editor defendants made no effort to reach Friedman for comment on that inflammatory allegation.

39.     The allegation of "gross misconduct" was and remains a serious charge. Had Friedman been given the basic courtesy of replying, he would have explained that he had passed "probation" with affirmative reviews just days before his dismissal (under Dutch law, once an employee passes probation it is very difficult for an employer to terminate them).

40.     Had Friedman been given the courtesy of a response, he would also have been able to express his view that his so-called "gross misconduct" was in fact retaliation for his having expressed concern about Palladyne's Ghaddafi links and about other

serious problems at the company.

41.    Had Friedman been given the courtesy of a response, he would also have explained that after the termination he asked Palladyne for an explanation, and that Palladyne had refused to offer one.

42.    Later that evening, Michael Hytha, the lead editor for the article, replied that "We are reviewing this." Exhibit 4.

43.    The following morning Friedman's counsel replied ("second warning," attached as Exhibit 5) to defendant Hytha:

> I spoke with my client and he is upset that Bloomberg is the only legit media vehicle that (1) did not contact us for comment and (2) took the [still unnamed] Palladyne PR person's comments unchallenged. Though the damage is done, Bloomberg is a fine media group and I think we should be granted that courtesy. [and] though the damage is done, [it] is always best to get the fairest version out.
>
> If your people would like to speak with me I'm available this morning by cellphone at [number redacted].

44.    Later on the morning of March 28, Friedman's counsel wrote again to Hytha ("third warning," Exhibit 6), expressing the view that the extortion accusation in the Article was libel *per se* and that the $500,000,000 damages allegation was libelous. He further requested that Hytha "… run that by your lawyers, check with your colleagues and let's have a talk on how to rectify this."

45.    In that same email he wrote:

> Bloomberg should not be in the business of taking libelous statements from PR flacks and publishing them, and in particular should never do so without checking with … the person against whom the statements were made.
>
> As I mentioned, the Wall Street Journal refused to print either the [$500M] damages claim or the extortion claim. I trust that, upon reflection, you will reach the same conclusion and fashion a fair and

proper remedy for my client.

46.     Notwithstanding defendant Hytha's pledge that he would "look into this,"

Friedman received no reply to either the first, the second or the third warnings.

47.     On Monday, March 31, 2014, not having received any reply, Friedman

again wrote to Hytha ("fourth warning," Exhibit 7):

> I am concerned that Bloomberg has allowed two of its online publications
> to distribute the challenged information for several days now. Any inquiry
> into the law of libel would disclose that an allegation of extortion (a felony)
> is libel per se. Further, the publication of the $500M claim for damages is
> literally more than ten times the amount in the complaint. I wrote to you
> promptly explaining the error but nothing has been done.
>
> We must, at this point, demand the following:
>
> 1. A correction to the article on these two major points, with comment from
> our side.
>
> 2. Disclosure of the persons representing Palladyne who transmitted this
> information to you.
>
> 3. Disclosure of the number of clicks on the articles in both bloomberg.com
> as well as Bloomberg Business Week.
>
> We plan to take legal action against whomever disseminated this false
> information, and prefer that your company not be among them. If we can
> resolve this today all the better…
>
> For Bloomberg to have published that information based on an unidentified
> "spokesman" is wrong. And to not have run the allegations by us for
> comment was wrong. This needs to be fixed, today.
>
> I may be reached at [redacted] or, alternatively on my cell at [redacted]

48.     Hytha did not reply to the first, second, third or fourth warnings and the

story continued to be disseminated around the world and made accessible on Google to

anyone seeking the plaintiff's name.

**Palladyne Engages a Crisis Management Advisor
To Counteract Mounting Negative Publicity**

49.     Beginning in 2010, Palladyne was becoming the subject of published

stories in the press and on the internet raising questions about its competence, its integrity

and its legitimacy.

50.     Among the first was the dissemination of a report by the Libyan

Investment Authority ("LIA"), dated May, 2010. The LIA and two other related Libyan

entities were, on information and belief, the source of approximately 90% of all of the

funds Palladyne had under management. The funds were a goldmine of unusually large

management fees that are typically associated with bribes and kickbacks.

51.     Further, the source of the $700,000,000 in Libyan funds (and exorbitant

fees exceeding $15,000,000 a year) diverted to Palladyne was defendant Abudher's

father-in-law, Shukri Ghanem, who, as noted, had been the Prime Minister of Libya

under the Ghaddafi regime and later the chief executive officer of the Libyan National

Oil Company. The oil company that Ghanem controlled was the source of Libya's

$50,000,000,000 sovereign fund for which the LIA was the primary investment vehicle.

52.     On information and belief, Palladyne had obtained $700,000,000 of those

funds to invest despite the absence of an investment track record or the human and

technological infrastructure to manage such investments. In fact, the funds had been

siphoned from the LIA accounts and transferred to Abudher, Ghanem's son-in -law,

(Ghanem later fled Libya during the revolution, was hiding from an Interpol red alert

(arrest warrant equivalent) for corruption and subsequently found dead, floating in the

Danube River in Vienna, in April 2012).

53.     The May, 2010 LIA report was based on a KPMG (London) audit of

Palladyne's handling of $300,000,000 of LIA funds and it was highly critical of Palladyne's "poor performance." The adverse report on Palladyne was written about in multiple publications, including the Financial Times.

http://www.ft.com/cms/s/0/1b5e11b6-d4cb-11e0-a7ac-00144feab49a.html

54.     Other publicity had been emerging, notably reports of an investigation by the Criminal Division of the U.S. Department of Justice along with the Securities and Exchange Commission. That investigation, which is still pending, was focused on evidence that Palladyne, through Abudher, had solicited a $50,000,000 bribe from Goldman Sachs.

55.     Goldman Sachs had also been investing funds for the LIA and had incurred serious losses due to complex derivative investments (those investments are currently the subject of litigation in London by the LIA against Goldman, *see e.g. http://dealbook.nytimes.com/2014/10/06/libyas-sovereign-fund-and-goldman-sachs-clash-in-court/?_r=0*).   Goldman was trying to negotiate a settlement with the LIA. On information and belief, at the behest of his father-in-law and another friend at the LIA, Abudher exploited Goldman's plight and converted it into an opportunity to interpose himself into the negotiations and solicit the bribe.

56.     Palladyne's reputational concerns mounted further when, in June of 2013, eight armed Dutch policemen accompanied by a high tech evidence unit raided Abudher's family apartment in Amsterdam as well as Palladyne headquarters. In August 2013 more than a half dozen Dutch publications reported on the raids and described Abudher and Palladyne as being under investigation for a more than $30,000,000 "Mega Fraud."

57.     And then, on March 25, 2014, Friedman filed his Inducement complaint, which received further publicity (as Friedman had cautioned Palladyne prior to filing).

### The Source of the Defamation is Identified

58.     At some point amidst this plethora of bad publicity, Palladyne elected to engage defendant Paddy Harversen and his firm Milltown Partners (Defendants Harversen, Collins, Rickman and Milltown are referred to collectively as "Milltown"). Milltown was formed in 2012 by the defendant partners, each of whom had experience in the fields of crisis, reputational and image management.

59.     When the Reporter and Editor defendants and Bloomberg failed to keep Hytha's March 27th pledge to respond to any of Friedman's four warnings (as well as his request that the Palladyne PR representative be identified), the plaintiff independently sought information to help identify the unnamed Palladyne "spokesman."

60.     It was subsequently learned that defendant Halverson had made calls to other reporters, publishing the same information to them that published in the Article. It was further learned that other information had been emanating from an email address known as press@palladyne.com

61.     On information and belief, defendants Yeo and Abudher managed the information disseminated through press@palladyne.com and also were the primary contact persons for the Milltown defendants.

62.     On information and belief, Milltown and the Palladyne defendants were the sources of the defamatory information published by the Bloomberg defendants, and Milltown and the Palladyne defendants were the source of libelous claims that Palladyne had published to the Wall Street Journal, the Financial Times, Euromoney  and other

prestigious international publications (all of whom declined to republish the defamatory material conveyed by Palladyne and Milltown).

63.     The publications identified in ¶ 62 are not named defendants because they adhered to correct professional standards of ethics and fairness and declined to publish the defamatory information conveyed to them by the Milltown and Palladyne defendants.

**COUNT I:     DEFAMATION (against all defendants)**

64.     The Article published and disseminated worldwide on March 27, 2014 by Bloomberg through its bloomberg.com and other related Bloomberg publications contained false and inflammatory accusations directed toward and that injured the plaintiff.

65.     The publication was disseminated throughout the world and accessible through the internet to any potential employer, business partner, investor, friend, family member or any other person with an interest, for any reason, in obtaining information about the plaintiff.

66.     Under the law of Connecticut, as reflected in the civil jury instructions for defamation set forth on the website of the Judicial Branch of the State of Connecticut, the elements of a defamation claim are (a) publication of a statement to a third person, (b) that the defamatory statement identify the plaintiff to the third person, and (c) that the plaintiff suffer injury to his reputation as a result of the statement.

67.     Under the law of New York, from which Bloomberg manages, prepares and disseminates information on its multiple websites and in its various publications, defamation is present and proven when (a) a false statement is (b) published to a third party without privilege or authorization (c) with fault amounting to at least negligence (d)

that caused special harm or defamation *per se*.

68.     The Palladyne and Milltown defendants published defamatory statements to Bloomberg and other publications with worldwide readership in the last week of March, 2014, by reaching out, *inter alia*, to Bloomberg in New York.

69.     Those statements were false. Friedman had not claimed damages in the amount of $500,000,000 in the Inducement Case, and Friedman had not "repeatedly tried to extort money from [Palladyne]." Further, Friedman had not been "dismissed for gross misconduct," but rather was terminated in retaliation for his having expressed concern within Palladyne about the illicit nature of its funding, financial arrangements, fees and incapacity to manage the funds entrusted to it.

70.     Bloomberg, acting through the Reporter and Editor defendants, published the false and defamatory statements worldwide on March 27, 2014 and continued to publish them thereafter on a daily basis, 24 hours a day.

71.     Initially, Bloomberg and the Reporter and Editor defendants published the defamation out of negligence and in direct contradiction of their professional ethics standards.

72.     Subsequently, by failing to correct or retract the defamatory statements after the first, second, third and fourth warnings; by failing to respond to Friedman or acknowledge his views and explanations; and by continuing to publish the information, Bloomberg and the Reporter and Editor defendants (collectively the "Bloomberg defendants") acted with reckless disregard of the plaintiff's reputation and caused him serious and irreparable harm.

73.     Neither the publication of the defamatory statements by the Milltown and

17

Palladyne defendants to Bloomberg and other publication, nor the publication of the Article by Bloomberg, is subject to any privilege.

74.     The publication of the claim that Friedman "repeatedly tried to extort money from [Palladyne]" was libel *per se* as it accused Friedman of having repeatedly engaged in felonious conduct.

75.     The publication of the defamatory statements was made at a time when all of the defendants were aware that Friedman was unemployed and looking for work.

76.     The publication of the defamatory statements was made at a time when all of the defendants were aware that Friedman's entire professional career had been in the management and investment of substantial sums of money in behalf of major institutions with fiduciary responsibilities to their investors.

77.     The publication of the defamatory statements was made at a time when all of the defendants were aware that a financial services executive accused of "repeatedly trying to extort money" from his employer could cause severe and irreparable harm to the plaintiff's employment prospects in his chosen career.

78.     The publication of the defamatory statements was made at a time when all of the defendants were aware that the assertion that Friedman had claimed $500,000,000 in damages would be perceived, as the Palladyne and Milltown defendants intended when they published it to Bloomberg and other publications, and as Bloomberg thereafter published to its worldwide readership, as "ludicrous" and would subject Friedman to ridicule and cause irreparable harm and foreclose his future prospects in the financial services industry.

79.     Bloomberg's Code of Journalism Ethics, *supra* at ¶24, states that "With

that freedom [of the press] comes the responsibility to practice our craft in accordance with the highest standards, [and] **to be accountable for what we publish**" (emphasis added).

80.     WHEREFORE, Friedman therefore asks that the Court award him $44,9410,00 to compensate for damage to his career and future earnings and to hold Bloomberg accountable under its own self-declared standards.

**COUNT II: PUNITIVE DAMAGES (against all defendants)**

81.     The allegations set forth above in ¶ 18 through ¶ 79 are repeated and realleged.

82.     Bloomberg published the defamatory statements through its print publications and its website managed from its headquarters in New York.

83.     The Palladyne and Milltown defendants directed and published their defamatory statements to Bloomberg through its reporters based in New York

84.     The defamatory statements were false and foreseeably caused harm to the plaintiff in Connecticut.

85.     Under the law of New York, punitive damages may be awarded when the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer.

86.     The Milltown and Palladyne defendants published the defamatory statements to cause deliberate harm to the plaintiff's reputation.

87.     The defamatory statements were false and inflammatory and designed to

19

(a) intimate Mr. Friedman into reluctance to pursue his Inducement Case, (b) deprive him of future employment through which he could raise funds to finance the Inducement Case and (c) create emotional harm to impede his pursuit of the Inducement Case.

88.     The Bloomberg defendants published, republished and continued to publish the defamatory statements online with full knowledge that (a) Friedman was pursuing the Inducement Case, (b) that Friedman was unemployed and (c) that Friedman's career in financial services would be severely compromised by repeated publication of the defamatory statements.

89.     The Bloomberg defendants are part of a vast and wealthy multinational publishing enterprise that has ready access to dozens of in house legal advisers as well as outside legal advisers in the world's most prestigious law firms.

90.     The Reporter and Editor defendants were part of a legal reporting team and fully familiar with the Federal Rules of Civil Procedure and its provisions for alternative pleading. Further, as legal reporters and editors, they knew or should have known that alternative theories of recovery do not allow for cumulative damages and that Friedman's Inducement Case did not contain a claim for $500,000,000 in damages.

91.     As experienced legal reporters and editors, the Reporter and Editor defendants knew or should have known the difference between a base claim for damages and the uncertain punitive, multiple and other damages claimed by Friedman.

92.     To the extent that the Bloomberg defendants had any uncertainty about any of the foregoing legal issues, they had ready access to substantial resources for legal advice to check any uncertainty they had about the defamatory statements – and about which they had been alerted *four times* by Friedman.

93. Defendant Hytha wrote to Friedman's counsel on March 27, 2014 and pledged that "we are looking into this." Hytha had a professional duty under the ethical guidelines of his employer to check the concerns expressed in the first, second, third and fourth warnings. He also had a professional duty to check with the client to identify any errors in the Article.

94. By making inquiries into the specific concerns expressed in the first warning, Hytha knew or should have known that the statements of the Milltown and Palladyne defendants were false or, at the least, should have caused him to contact Friedman's counsel to explain why Bloomberg would not publish a correction or retraction.

95. The actions of the defendants were gross, wanton, willful, intentional and malicious and involved a high degree of moral culpability.

WHEREFORE, the plaintiff asks that the Court award punitive damages in a sum to be determined by the jury.

DAN FRIEDMAN, Plaintiff

By: _/s/ Alan H. Kaufman_ (ct 29258)_
Kaufman LLC
200 Park Avenue, 17th Floor
New York, New York 10166
Tel:   212.257.0900
Fax:   212-897-2370
Email: akaufman@kaufmanllc.net

Stephen Grygiel, Esq.
*Pro Hac Vice* to be filed
Silverman, Thompson, Slutkin, &
        White, LLC
212 North Charles Street
Baltimore, Maryland 21202
Tel:   410-385-2225

Fax:     410-547-2432
Email: sgrygiel@mdattorney.com